UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANR PIPELINE COMPANY,

       Plaintiff/Counter-Defendant,

v.

60 ACRES OF LAND, more or less, in
Lake County, Michigan; EARL G. COON;
MARLENE F. COON; CARL H. MEYER;
DOROTHY L. MEYER; WILLIAM O.
LUTZ, TRUSTEE OF THE ELEANOR G.
NYQUIST LUTZ REVOCABLE TRUST;
and UNKNOWN OWNERS,

       Defendants/Counter-Plaintiffs.

_____/

File No.  1:04-CV-824

HON. ROBERT HOLMES BELL

## **O P I N I O N**

Plaintiff ANR Pipeline, Inc. ("ANR") filed this condemnation action to acquire certain subsurface strata and formations for the storage of natural gas.  ANR seeks to condemn only the subsurface formations for storage and not the native gas itself.  Defendants/Counter-Plaintiffs Earl G. Coon, Marlene F. Coon, Carl H. Meyer, Dorothy L. Meyer, and William O. Lutz, Trustee of the Eleanor G. Nyquist Lutz Revocable Trust, (collectively referred to as "Defendants"), the owners of the subsurface strata and formations at issue, have filed a counterclaim alleging inverse condemnation, de facto condemnation, conversion and unjust enrichment.

This matter is currently before the Court on ANR's motions for summary judgment on all four counts of Defendants' counterclaim and on Defendants' motion for summary judgment on ANR's affirmative defense #2 asserting statute of limitations and laches.

## I.

Summary judgment may be entered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the moving party carries its burden of showing there is an absence of evidence to support a claim then the non-moving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## II.

The essential facts are not in dispute. The Reed City Stray natural gas field was discovered in 1940. Native gas was produced from the field from 1941 to 1947. (Gentges Aff. ¶ 11). ANR, a natural gas company within the meaning of the Natural Gas Act, 15

U.S.C. §§ 717-717z, obtained a Certificate of Public Convenience and Necessity from the Federal Power Commission, the predecessor to the Federal Energy Regulatory Commission ("FERC"), on July 12, 1950, to operate the Reed City Storage Field in the Stray formation as part of ANR's interstate natural gas transportation and storage system. ANR commenced storage operations at the Reed City Storage Field in 1952. (Appl. for Amend't at 3). ANR uses the subsurface storage fields for the primary purpose of delivering natural gas during the winter months. ANR injects gas into the formation in the warmer months and then withdraws the gas in the winter months for distribution. (Gentges Aff. ¶ 5). The gas is stored in pores within the subsurface rock formation. The average porosity of the Reed City Stray formation is 17%. (Brock Dep. at 68-69; Gentges Aff. ¶ 9).

Defendants' property is located on the fringe or edge of the Reed City Stray formation. Although no test wells were drilled on the Defendants' property when the Reed City Stray field was discovered, test wells in the vicinity revealed that the formation under the Defendants' property most likely contained formation water (brine) rather than natural gas. (Brock Dep. at 51-52; Gentges Dep. at 111-12, 175-76). After the formation began to be used as a storage facility and gas was injected into it, the native gas was pushed toward the fringes of the formation, and into the area under the Defendants' property. Every year an average of 140,000 mcf of native gas is pushed under and then pulled out from under Defendants' property. (MacDonald Dep. at 166). There is no evidence that any injected gas has migrated or been forced under Defendants' property. (MacDonald Dep. at 155).

In 1996 the Defendants drilled a well – the Coon 1-36 well – on the Coon parcel into the Loreed formation which is below the Reed City Stray formation.  Defendants were joint participants in the well.  (M. Coon Dep. at 11-12).  The construction of that well led to previous litigation between ANR and Defendants.  ANR claimed the extraction impacted its storage operations in the Loreed formation because the gas that was being extracted included gas which had been injected by ANR into the Loreed storage field.  Defendants contend that their extraction merely reduced the base gas in the field.  In any event, as a result of the litigation, the well's perforation into the Loreed formation was plugged.

On July 29, 1999, ANR obtained an amendment of its Certificate of Public Convenience and Necessity from the FERC.  The amended certificate extends the boundaries of the storage field to include that portion of the Reed City Stray formation that is under Defendants' property.  With the revised boundaries, the Reed City Storage Field now encompasses over 16,000 acres of land.  (Gentges Aff. ¶ 9).  The certificate authorizes the holder to operate the storage field and to exercise the federal eminent domain authority of the United States within the boundaries of the field to acquire the property interests necessary for that operation. 15 U.S.C. § 717f(h).

In 2000 Defendants raised the Coon 1-36 well so that it perforated the Reed City Stray formation.  They have been extracting minimal quantities of gas from the well, primarily for residential heating.  A sample of gas produced by the Coon 1-36 well was analyzed in 2001 and ANR determined that the well was producing native gas, not the injected working gas of ANR.  (Gentges Dep. at 190, 198).  ANR determined that the Defendants' extraction of

4

native gas from the Reed City Stray formation did not affect ANR's interests, and accordingly elected not to condemn Defendants' mineral rights in the Reed City Stray formation.  ANR states in its complaint that its acquisition of the storage area is without prejudice to Defendants' rights to drill into the formation and to produce and remove native oil, gas or other minerals.  (2nd Am. Compl ¶ 11).

Defendants filed a counterclaim for the value of the native gas under their property. They allege that since 1952 ANR has taken control over and has been continuously using the Defendants' native gas as base gas and using their formations for ANR's storage operations. (Countercl. ¶ 9).  Defendants' counterclaim is the subject of these motions.

### III.

Defendants allege in Counts I and II of their amended counterclaim that ANR's past and current use, without authorization, of Defendants' formations and their base gas constitutes a taking of their property rights for which they have not been compensated. (Countercl. ¶ 18).  Defendants allege that ANR has taken their property by its physical intrusion onto Defendants' property beginning in at least 1960, and by impressing Defendants' property into serving a public use from at least that date, and that it has effectuated a *de facto* taking through its announcements of condemnation and subsequent actions.  (Def. Br. in Opp. at 2).

"Inverse condemnation is a taking of private property for a public use without the commencement of condemnation proceedings. Under the Michigan and United States Constitutions, a victim of such a taking is entitled to just compensation for the value of the

5

property taken." *Hart v. City of Detroit*, 416 Mich. 488, 494, 331 N.W.2d 438, 441 (1982) (footnotes omitted).  Michigan recognizes a cause of action for inverse condemnation "when the state fails to utilize the appropriate legal mechanisms to condemn property for public use."  *Peterman v Dep't of Natural Res.*, 446 Mich. 177, 187-88, 521 N.W.2d 499 (1994).  *See also Vanderlip v. Grand Rapids*, 73 Mich. 522, 41 N.W. 677 (1889).

ANR moves for summary judgment on Defendants' inverse condemnation claims because it contends there is no evidence of any unlawful intrusion onto Defendants' property, because there has been no  action by ANR directed at Defendants' property that has had any detrimental impact on or has caused any interference with the Defendants' use, and because its actions do not amount to a *de facto* taking.  The Court will address each of Defendants' inverse condemnation theories separately.

## A.  Physical Intrusion

Defendants contend that ANR has physically invaded or intruded onto its property because all of the experts in this case have acknowledged that ANR has pushed native gas under their property.  Gas is physical.  It has mass.  And it has been forced under Defendants' property.  According to Defendants, this constitutes a physical intrusion sufficient to support their inverse condemnation claim.

There is no dispute that a condemning authority's physical intrusion onto private property may be the basis of an inverse condemnation claim.  Neither is there any dispute that ANR's injection of gas into the Reed City Stray formation has forced native gas under the Defendants' property.  Nevertheless, the physical invasion cited by Defendants is not one that is recognized under the law.

6

The movement of gas underground across property lines is a lawful dynamic of the fugitive nature of native gas.  "Oil and gas, unlike other minerals, do not remain constantly in place in the ground, but may migrate across property lines."  *Wronski v. Sun Oil Co.*, 89 Mich. App. 11, 21, 279 N.W.2d 564, 569 (1979).  Based upon this migratory tendency of oil and gas, a rule of capture has evolved which provides:

> The only ownership that one can have in unproduced oil and gas is the right, to the exclusion of all others, to reduce the same to possession and thereby acquire title thereto.  This fundamental precept of oil and gas law, commonly known as the "law of capture", is based upon the fugitive nature of oil and gas, and has been uniformly adopted throughout the United States.

*Michigan Consol. Gas Co. v. Muzeck*, 4 Mich. App. 502, 507, 145 N.W.2d 266 (1966).

> The owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though it may be proved that part of such oil or gas migrated from adjoining lands. Under this rule, Absent some state regulation of drilling practices, a landowner . . . is not liable to adjacent landowners whose lands are drained as a result of such operations . . . .  The remedy of the injured landowner under such circumstances has generally been said to be that of self-help "go and do likewise".

*Wronski*, 89 Mich. App. at 21 (quoting William and Meyers, OIL AND GAS LAW, § 204.4, pp. 55-57).

The potential harshness of the rule of capture is mitigated by the "fair share" principle. *Id.* at 21-22.  The fair share principle affords each owner "a reasonable opportunity to produce his proportionate part of the oil and gas from the entire pool and to prevent operating practices injurious to the common reservoir."  *Id.* at 23 (quoting *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 582, 210 S.W.2d 558, 562 (1948)). The fair share principle is generally reflected in statutes and conservation orders.  *Id.*  "The rule of capture is thus modified to exclude operations that are in violation of valid conservation orders."  *Id.*

Extraneous or injected gas is subject to different rules.  Injected gas which has previously been produced, reduced to possession, and then reinjected into the ground is not subject to the rule of capture.  Once severed from the realty, gas becomes personal property, and title to that property is not lost when it is injected into underground storage reservoirs. *See*, *e.g*., *Ellis v. Arkansas Louisiana Gas Co.*, 450 F. Supp. 412, 419 (E.D. Okla. 1978); *White v. New York State Natural Gas Corp.*, 190 F. Supp. 342, 349 (W.D  Pa. 1960).  Accordingly, if injected gas moves across boundaries there may be a trespass.

None of the cases cited by Defendants in support of their physical intrusion theory of inverse condemnation considered the movement of native gas across property boundaries.  All of them involved a physical encroachment on or near the surface of the property by something introduced by the condemning authority.  For example, in *Vanderlip v. Grand Rapids*, 73 Mich. 522, 41 N.W. 677 (1889), the grading to support the City's proposal to elevate a road would have covered 30 feet of the plaintiff's property with earth and buried her front door and windows.  *Id.* at 525.  The other physical intrusion cases cited by Defendants are similar.  *See*, *e.g*., *Bauerle v. Charlevoix County Road Comm'n*, 388 Mich. 520, 201 N.W.2d 799 (1972) (filling of a pond for erection of road across pond impaired plaintiff's riparian rights); *Olsen v. Dearborn*, 290 Mich. 651, 288 N.W.2d 295 (1939) (construction and maintenance of sewer and water mains across plaintiff's property); *Defronzo v. Port Sanalac*, 166 Mich. App. 148, 153, 419 N.W.2d 756 (1988) (construction of walkway across plaintiff's property); *Standen v. Alpena County*, 22 Mich. App. 416, 177 N.W.2d 657 (1970) (taking of aviation easement by flying planes over plaintiff's property);

*Gunn v. Delhi Twp.*, 8 Mich. App. 278, 289, 154 N.W.2d 598 (1967) (construction of sewer that cut across corner of plaintiff's property).

In this case the only gas Defendants claim is under their property is native gas. They do not claim a trespass by extraneous gas. The Court is satisfied that from a legal perspective, the underground movement of native gas across property boundaries does not constitute the kind of physical intrusion that would support an inverse condemnation claim.

## B. Impressed into Public Use

In the alternative, Defendants contend that there has been inverse condemnation by a non-physical intrusion because ANR has impressed Defendants' properties into serving a public use.

According to Defendants, ANR is using the native gas beneath their property as base or cushion gas for its storage operations. Defendants contend that when a condemning authority incorporates private property into a public project, and does not provide the owner with just compensation, the result is a taking subject to an inverse condemnation action.

There is a factual dispute as to whether the native gas under Defendants' property is in fact benefitting ANR and being impressed into serving a public use. ANR has presented evidence from its experts that the gas is not in close enough proximity to the withdrawal wells to physically assist in the withdrawal of the working gas during the short 90-120 day delivery period. (MacDonald Dep. at 100, 157-160; Gentges Dep. at 161-63, 199-201). Defendants' expert, on the other hand, has testified that the native gas under Defendants' property is instrumental to ANR's operation of the Reed City Storage Field because it

provides necessary pressure to allow the efficient operation of the storage field. (Brock Dep. at 95-100, 104-05). For purposes of this motion, the Court will assume that the native gas beneath Defendants' property does in fact have functional value to ANR.

Assuming that the native gas beneath Defendants' property has in fact been impressed into public service, that alone is insufficient to support a finding of a taking. An inverse condemnation claim requires more than a showing that private property has been put to some public use. Where an inverse condemnation claim is based upon a non-physical intrusion there must be a showing of some harm to claimant such as 1) diminution in value, 2) serious injury to property, or 3) interference with use of the property. *See Heinrich v. City of Detoit*, 90 Mich. App. 692, 697, 282 N.W.2d 448 (1979). All of the cases cited by Defendants involve one of these elements of harm. For example, in *Tamulion v. Waterway Comm's*, 50 Mich. App. 60, 212 N.W.2d 828 (1973), the defendants constructed a harbor and caused erosion of the plaintiff's property that was adjacent thereto. When that erosion threatened the value of the harbor, they dumped tons of jagged rocks and boulders on the entire length of the plaintiff's beach, making access to the water virtually impossible and unsafe, and destroying the utility of the property as a lakeside residence. 50 Mich. App. at 63. Based upon its consideration of the entire circumstances of the case, the court found a taking because this was a case in which "property neighboring a government project does not merely suffer some damage as a consequence of the government's construction of the project, but is actually impressed into serving a public use in the functioning of the project." *Id.* at 67.

Although Defendants rely on *Fox v. Ogema County*, 208 Mich. App. 697, 528 N.W.2d 210 (1995), the majority opinion in that case did not mention inverse condemnation or taking. To the extent that the dissent would have found a taking, the taking was based on the existence of a nuisance that interfered with the plaintiff's enjoyment of its property. *Id.* at 704-06. Finally, in *Jones v. East Lansing-Meridian Water and Sewer Auth.*, 98 Mich. App. 104, 296 N.W.2d 202 (1980), the court held that "Defendants did impress Plaintiffs' private property into serving a public use by unreasonably interfering with Plaintiffs' subterranean water rights." *Id.* at 110. Clearly, taking property for a public use must be accompanied by harm before it will be cognizable as a taking subject to an inverse condemnation claim.

Unlike the cases they have cited, Defendants have not shown harm. Defendants' use and enjoyment of their property is not affected by the presence of native gas in the Stray formation beneath their property. Defendants have presented testimony that they are troubled by the possibility that ANR will condemn their mineral rights if they begin extracting injected gas from their well. (E. Coon Dep. at 35). However, that possibility is one that has arisen through appropriate legal channels, and if their mineral rights are ultimately condemned, the condemnation process is designed to put them in as good a position as they would have been if the taking had not occurred. *Petition of Mackie*, 362 Mich. 697, 699, 108 N.W.2d 755, 756 (1961). In the meantime, there is no evidence that ANR has interfered with Defendants' ability to extract native gas from their well.

Defendants have also presented evidence that in the summer of 2002 when they tried to produce gas for commercial sale, their well produced too much water to make the

commercial venture economically feasible.  Defendants testified to their theory that ANR conspired with others to withdraw more gas than they had previously drawn from the wells nearest to the Coon 1-36 well in an effort to prevent Defendants from being successful in their commercial venture.  (E. Coon Dep. at 17-18, 27-29; M. Coon Dep. 52-53, 56, 82).

Defendants' theory regarding the basis for their inability to begin a viable commercial venture is speculative at best.  Defendants have no evidence that ANR pulled more gas from the wells nearest Defendants' property.  Defendants have no evidence of a conspiracy.  Even if a reasonable inference might be made that ANR's withdrawal of gas resulted in the movement of the native gas and the entry of more water in Defendants' well, that is not evidence of a legally recognizable diminution in value or interference.  Under the law of capture both ANR and Defendants have the right to  produce from the same pool of native gas when it exists within their lands.  In addition, the Court notes the inconsistency in Defendants' positions: Defendants complain on the one hand that ANR has pushed gas under their property, but then complain on the other hand when the gas moves out from beneath their property and they are no longer able to extract it.

Defendants have not come forward with any evidence that ANR's actions have caused any diminution in the value of their land, any serious injury to their property, or any interference with their use of the property.  They have accordingly failed to make out a taking based upon their property being impressed into public service.

**C.  De Facto Taking**

In Count II of their counterclaim Defendants allege inverse condemnation under the theory of *de facto* taking.  Defendants allege that ANR's failure to initiate a condemnation proceeding regarding Defendants' native gas, and its threat to file such a proceeding at some unknown time in the future, has the effect of limiting Defendants' full use of their property and constitutes a taking of their property without just compensation.  (Countercl. ¶¶ 22-23). Defendants contend that although they are able to withdraw a small amount of gas from their well for residential purposes, they are precluded from making use of the much larger quantities of gas located within the Stray formation under their properties for commercial purposes because of the announcements and actions of ANR.

A cause of action for *de facto* condemnation has been recognized by the courts to prevent a condemning authority from taking deliberate acts to reduce the value of private property for the purpose of reducing its ultimate condemnation costs.  *Detroit Bd. of Ed. v. Clark*e, 89 Mich. App. 504, 508 , 280 N.W.2d 574, 576 (1979).  "Deliberate acts" have been found to include:

> the filing of *lis pendens*, the published threat of condemnation, mailing letters and circulars concerning the project to area residents, refusing to issue building permits for improvements coupled with intense building violation inspection, reductions in city services to the area, and protracted delay and piecemeal condemnation and razing.

*Id.* at 509.  However, "[t]he mere threat of condemnation and its attendant publicity, without more, is insufficient" to constitute a taking.  *Heinrich v. City of Detroit*, 90 Mich. App. 692, 698, 282 N.W.2d 448, 450-51 (1979).  "Threats must be coupled with affirmative action such

as unreasonable delay or oppressive conduct directed to the neighborhood as a whole." *Detroit Bd. of Educ.*, 89 Mich. App. at 509.  "In those cases finding a taking, the courts examined both the intensity and form of the accompanying publicity and the deliberateness of specific actions directed at a particular plaintiff's property by the city to reduce its value." *Heinrich*, 90 Mich. App. at 698.   "[B]efore a court may conclude that a taking occurred, it must examine the totality of the acts alleged to determine whether the governmental entity abused its exercise of legitimate eminent domain power to plaintiff's detriment." *Id.*

In *Detroit Board of Education*, 89 Mich. App. 504, 280 N.W.2d 574 (1979), the court of appeals affirmed a finding of a *de facto* taking where the Board of Education had announced intentions to condemn the plaintiff's neighborhood for a new high school, but failed to condemn the plaintiff's property for many years, resulting in uncertainty as to what property would be taken, deterioration of the neighborhood, destruction of houses, inability to attract tenants, and decrease in the value of the plaintiff's property.  *Id.* at 507.

In *Merkur Steel Supply, Inc. v. Detroit*, 261 Mich. App. 116, 127-30, 680 N.W.2d 485 (2004), the court affirmed a finding of *de facto* inverse condemnation where the City approved condemnation of the area around the airport which included the plaintiff's property, the City failed to take any steps toward condemnation of the plaintiff's property in over ten years, the City condemned few of the properties and let the majority of the properties decline, and the City simultaneously prevented plaintiff from expanding its operations.  *Id.* at 132-33, 139-40.  The court of appeals characterized the City's actions as "a case of blight by planning."  *Id.* at 139.

14

Defendants rely on the following evidence in support of their *de facto* taking claim: ANR's announcement that it would be condemning the storage and mineral rights within the de facto boundaries of the Reed City Storage Field; ANR's announcement that it would and "must" acquire the natural gas within the expanded boundaries of the Reed City Storage Field; ANR's notification that it would condemn Defendants' well if injected gas was found in it; and Defendants' belief that ANR has conspired to thwart their ability to economically produce gas from their well for commercial use. Defendants contend that as a result of these actions they will never be able to consider their mineral interests to be safe from condemnation, and that this uncertainty creates at least an issue of fact as to a *de facto* taking.

Contrary to Defendants' implications, ANR did not mislead the FERC into believing that it would be condemning all storage and mineral rights of all property owners in both the storage and the fringe protection area. ANR requested condemnation authority from the FERC to enable it to protect the integrity of its storage fields.[1]  ANR's Application is not

_____

[1]ANR's February 1999 Abbreviated Application for Amendment to Certificates of Public Convenience and Necessity ("Application") states in pertinent part:

> With few exceptions, ANR has acquired storage and mineral rights within the current boundaries of these fields, but requests that the Commission amend the certificates to confirm the current boundary of each field so that if issues arise which cannot be settled voluntarily, ANR can protect the integrity of the field and its operations through condemnation.
>                                     . . .
> ANR is concerned that unless the certificates are amended to reflect the current boundary of each field, including an appropriate fringe protective area, a situation could arise where third parties could threaten the integrity of the fields through

(continued...)

addressed solely to Defendants' property.  It applies to three storage fields located in four counties in Michigan, and it covers both the storage area and a fringe protective area for each of the three storage fields.  ANR sought the Certificate so that it could acquire property by eminent domain "where necessary."  ANR acknowledged that it would "typically" acquire both storage rights and mineral rights, and that it would be required to obtain both rights where there was native gas in the storage formation.[2]  ANR did not suggest what rights it would need to obtain in the fringe protective area.

_____

[1](...continued)
> drilling activities in lands ANR has not acquired, but which are within the historical operating boundary of the field.

(Application at 4 & 7).

[2]ANR's July 1999 Supplement to the Certificate Filing ("Supplement") states as follows:

> [T]he Commission certificate is necessary to enable ANR to acquire property by eminent domain, where necessary. Typically, the property rights which ANR will acquire include both storage rights and mineral rights. While storage rights give ANR the ability to store gas within a particular area, it is also necessary to acquire mineral rights within the boundary of the storage field.  If native gas exists in a formation, it will be used for storage operations and therefore must be acquired by ANR. In addition, production of the minerals from the storage formation would disrupt the operation of the storage field and, therefore, ANR must purchase those minerals from the owners to compensate them fully for ANR's use of the formation. The Commission's certification of the current boundaries of the fields at issue will enable ANR to acquire both storage rights and mineral rights necessary to assure the continued operation of these fields to provide storage service in interstate commerce.

(Supp. to Certif. Filing at 2) (emphasis added).

16

In a letter dated February 26, 2001, in response to an inquiry from Defendants, ANR advised that, based upon the nature of the gas being withdrawn from Coon 1-36 well, it did not at that time object to Defendants' production of gas from that well.  However, ANR advised that did assert ownership of gas injected into the storage field and that it would pursue appropriate remedies if and when it appeared that injected gas was being produced from the Coon 1-36 well.

ANR's notification that it would allow Defendants to continue to produce gas until such time as injected gas was withdrawn from the well is simply a notification of its legal right and obligation to condemn if such should be necessary to protect the integrity of the storage field.  *See City of Grand Rapids v. Grand Rapids & Indiana Ry. Co.*, 66 Mich. 42, 52-54, 33 N.W.15 (1887) (holding that all properties in city were subject to power of eminent domain and that city could not contract away its power of eminent domain).

As noted previously, Defendants' suspicion that ANR conspired to thwart their ability to economically produce gas from their well for commercial use is based upon speculation and is not supported by any evidence sufficient to create an issue of fact for trial.

Upon review of the totality of the circumstances, the Court is satisfied that the evidence is not sufficient to create an issue of fact for trial regarding a *de facto* taking.  There is nothing in the evidence of record to indicate that ANR has taken deliberate acts to reduce the value of Defendants' property for the purpose of reducing ANR's ultimate condemnation costs.  Neither does the evidence tend to show that ANR has abused its eminent domain authority.

Defendants have failed to produce sufficient evidence to create an issue for trial with respect to any of their theories of inverse condemnation.  Accordingly, ANR is entitled to summary judgment on Counts I and II of Defendants' counterclaim.

## IV.

Defendants allege in Count III of their counterclaim that ANR's use, without authority, of their native gas and storage formations constitutes a wrongful act of conversion. (Countercl. ¶¶ 25-26).  Defendants do not allege in their complaint that ANR has removed any native gas.  Instead, they contend that ANR has used the native gas in the ground as base gas or cushion gas in ANR's storage operations.

"A conversion is any distinct act of dominion wrongfully exerted over another person's personal property."  *Pamar Enterprises, Inc. v. Huntington Banks of Mich.,* 228 Mich. App. 727, 734, 580 N.W.2d 11, 15 (1998) (quoting *Trail Clinic, PC v. Bloch*, 114 Mich. App. 700, 705, 319 N.W.2d 638 (1982)).  Gas, however, is a part of the realty until severed therefrom.  *Jaenicke v. Davidson*, 290 Mich. 298, 303, 287 N.W. 472, 474 (1939) (citing *Eadus v. Hunter*, 268 Mich. 233, 237-38, 256 N.W. 323, 325 (1934)).  Because gas, until it is extracted, is part of the realty rather than personal property, its "use" in Defendants' storage operations cannot form the basis for a conversion claim.  Defendants have no claim for conversion because they have not alleged that ANR has exerted dominion over any of Defendants' personal property.  *See Keasler v. Natural Gas Pipeline Co.*, 569 F. Supp. 1180 (E.D. Tex. 1983) (use of gas in underground storage field as base gas or cushion gas does not give rise to a conversion claim).

Defendants acknowledge that severance of the gas is essential to a claim for conversion, but they argue that pushing the gas back and forth over property lines could constitute severance.  Defendants' novel argument runs contrary to all existing authority and cannot be followed by this Court.

Although Defendants did not allege extraction of native gas in their counterclaim, discovery responses or expert reports, in response to ANR's motion for summary judgment they have produced evidence that a gas sample from one ANR well, RC-144, 3/4 miles from the Coon 1-36 well, indicated "a mixture of mostly injected gas with a small amount of native gas."  (Gentges Rpt. at 3).  Defendants have also produced an affidavit from their expert opining that "it is as likely as not that the RC-144 well and potentially other ANR withdrawal wells have withdrawn native gas from under the Coon and Meyer property." (Brock Aff. at ¶ 7).

Defendants' evidence of severance is not only untimely, but it is also insufficient to raise a genuine issue of material fact.  Defendants' expert's opinion that it is "as likely as not" that ANR has extracted gas from under Defendants' property is not sufficient to meet their burden of proof on the source of the native gas.  Moreover, even if ANR has extracted native gas, ANR is lawfully entitled to produce from the well, whether the gas withdrawn is native gas or injected gas.  ANR can extract native gas under the rule of capture, subject only to the rule of fair share.  Defendants have not shown that ANR's extraction of native gas has exceeded its fair share.

19

Defendants have failed to show that there are any questions of fact for trial on their conversion claim.  ANR is accordingly entitled to summary judgment on Count III of Defendants' counterclaim.

## V.

In Count IV of their counterclaim Defendants allege that ANR is benefitting from its use of Defendants' formations and native gas, and that it is unjust for ANR to receive and retain this benefit without compensating Defendants for that benefit.  (Countercl. ¶¶ 29-31).  According to Defendants, ANR receives a benefit by the presence of the native gas under Defendants' property because it cushions and increases the pressure on the stored gas and makes it easier to extract.

Unjust enrichment is an equitable doctrine.  Under this doctrine, "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Kammer Asphalt Paving Co., Inc. v. East China Tp. Schools*, 443 Mich. 176, 185, 504 N.W.2d 635, 640 (1993) (quoting Restatement, Restitution, § 1, p. 12).

As noted above, there is a factual dispute as to whether or not ANR is receiving a benefit.  For purposes of this motion the Court will assume that ANR is receiving a benefit. Nevertheless, even if ANR received a benefit from the native gas under Defendants' property, the Court finds nothing in the facts of record to support Defendants' assertion that it would be unjust under the circumstances for ANR to retain that benefit.  Defendants have not shown that they have been harmed by the presence of the gas.  Instead, it is clear that Defendants themselves have benefitted by ANR's action of pushing native gases under Defendants'

20

property where Defendants then have a right to capture it.  A fundamental rule of equity is that one with unclean hands cannot seek equity.  *Stachnik v. Winkel*, 394 Mich. 375, 382, 230 N.W.2d 529 (1975).  The Court does not consider Defendants' extraction of the gas to be evidence of unclean hands.  Nevertheless, in the absence of evidence of a specific harm, the Court concludes that because Defendants' are receiving a benefit from the presence of the gas, equity does not entitle them to damages for the presence of that same gas.

Accordingly, ANR is entitled to summary judgment on Count IV of Defendants' counterclaim.

## VI.

This Court has determined above that ANR is entitled to summary judgment on all four counts of Defendants' counterclaim.  In light of this determination, it is not necessary for the Court to consider ANR's alternative argument that it is entitled to summary judgment on Defendants' counterclaim because each of the claims is barred by the applicable statute of limitations, nor is it necessary to consider Defendants' cross-motion for partial summary judgment on ANR's statute of limitations affirmative defense.  Nevertheless, in an exercise of caution, the Court will also speak briefly to this alternative basis for summary judgment.

The parties agree that the statute of limitations for inverse condemnation actions is six years.  *See Hart v. City of Detroit*, 416 Mich. 488, 503, 331 N.W.2d 438 (1982) (applying six-year statute of limitation to inverse condemnation action).  They disagree as to whether the statute of limitations for conversion claims and unjust enrichment claims is three years or six years and they disagree as to whether the discovery rule applies to these claims.  The

Court need not decide these issues because it is clear that even if a six-year statute of limitations applies to all of Defendants' claims, and even if the discovery rule applies to all of Defendants' claims, Defendants' claims are nevertheless time-barred.

Under the discovery rule, a claim accrues "when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered . . . (1) an injury, and (2) the causal connection between plaintiff's injury and the defendant's breach [of duty to the plaintiff]." *Lemmerman v. Fealk*, 449 Mich. 56, 66, 534 N.W.2d 695, 698 (1995) (quoting *Moll v. Abbott Laboratories*, 444 Mich. 1, 16, 506 N.W.2d 816 (1993)).  For purposes of the discovery rule, the knowledge of the plaintiffs' agents may be imputed to the plaintiffs themselves.  *See Bauer v. Ferriby & Houston, P.C.,* 235 Mich. App. 536, 538 n.1, 599 N.W.2d 493 (1999) (noting that plaintiff's attorney's knowledge is imputed to plaintiff for purposes of the discovery rule); *Forest City Enterprises, Inc. v. Leemon Oil Co.*, 228 Mich. App. 57, 75, 577 N.W.2d 150, 159 (1998) (holding that landlords' agents' knowledge of spill giving rise to claim was imputed to landlord).

The Defendants did not file their counterclaim until March 31, 2005, amended July 27, 2005, and Lutz added in October 2005.  Defendants contend that they did not have knowledge of ANR's use of their gas until 2005, and they were not even aware that ANR was operating a storage field in the Stray formation until February 2001, at the earliest, after they dug their well and learned that their well was in communication with ANR's wells.

Defendants' asserted lack of knowledge of ANR's operation of the Reed City Gas Storage Field is refuted by their attorney's 1994 letters.  On or about March 29, 1994,

22

Defendants' attorney sent a letter to Primark Storage Leasing, ANR's lessor. The subject line of the letter provides that the letter is regarding "the Loreed Gas Storage Field" and the "Reed City Gas Storage Field." The letter contained an offer to lease the Defendants' property for gas storage and indicated Defendants' expectation that they would be compensated for the previous years in which Primark had stored gas on their property without permission to do so. In a follow up letter dated May 18, 1994, again referencing the "Loreed Gas Storage Field" and the "Reed City Storage Field," Defendants attorney indicated that Defendants had begun making preparations for drilling a well to recover any natural gas under their property. Copies of the letter were sent to Defendants.

Whether or not each of the Defendants understood that there were two storage fields under their property that were being used by ANR, the evidence is unrefuted that their attorney recognized the existence of both fields in 1994. Their attorney's knowledge is imputed to Defendants. Accordingly, the statute of limitations on all of Defendants' claims began to run in 1994, and their action on those claims, which was not brought until 2005, is clearly time-barred.

An order and partial judgment consistent with this opinion will be entered.


Date:    February 28, 2006          /s/ Robert Holmes Bell
                                    ROBERT HOLMES BELL
                                    CHIEF UNITED STATES DISTRICT JUDGE